UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| ROBERT STEPHEN HOCKEN, | ) | |
| JOAN MICHELLE HOCKEN, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | Bankruptcy No. 05-07010 |
| -------------------------- | ) | |
| WESLEY B. HUISINGA, | ) | |
| | ) | Adversary No. 06-09093 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| GREATER QUAD CITY | ) | |
| AUTO AUCTION, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER RE: COMPLAINT TO AVOID TRANSFER AND FOR TURNOVER**

This matter came before the undersigned on January 24, 2007. Trustee Wesley B. Huisinga was represented by attorney Abbe M. Stensland. Defendant Greater Quad City Auto Auction was represented by attorney Jeffrey C. McDaniel.  After the presentation of evidence and argument, the Court took the matter under advisement.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E).

**STATEMENT OF THE CASE**

The Chapter 7 Trustee alleges that Debtor sold property of the estate post-petition and that Defendant acquired the proceeds of these sales.  Trustee's complaint seeks turn over of these proceeds pursuant to 11 U.S.C. § 550.

**STATEMENT OF FACTS**

Debtor Robert Hocken owned a used car dealership in Rowley, Iowa.  He routinely acquired his inventory of used cars at auto auctions.  Prior to filing his Chapter 7 petition on October 14, 2005, Debtor purchased three such vehicles at an auction operated by Defendant Greater Quad City Auction ("the Auction").  The Auction is based in Milan, Illinois.

Debtor took advantage of the Auction's "float" program to purchase these vehicles.  The float program allows a dealer to bid on a vehicle at auction even when he lacks funds for the purchase.  For a fee, the Auction "floats" the dealer the funds to purchase the vehicle.  It does so by writing a check directly to the seller.  Such programs are apparently quite common among auto auctions.

Under this particular float program, the seller signs the certificate of title without designating a buyer, and the dealer receives a sales ticket listing the dealer as the buyer of the vehicle and the original seller as the seller.  The Auction retains the certificate of title to the vehicle, as well as a check from the dealer, until the dealer acquires funds sufficient to allow the Auction to cash the check.  Once the Auction cashes the dealer's check, the Auction enters the dealer's name as buyer on the certificate of title and mails the certificate to the dealer.  The assignment from the seller to the dealer on the certificate of title is backdated to the date of the auction. The Auction never writes its own name on the certificate of title, nor is it listed as a buyer or seller on the sales ticket or any other document.

A typical float allows the dealer fifteen days to deposit sufficient funds in his bank account. Usually the dealer will acquire these funds by selling the vehicle purchased at auction. At the Auction's discretion, a float period may be extended in exchange for an additional fee.  When a dealer cannot sell a car purchased at auction, the Auction typically will allow the dealer to return the car.  The Auction will then attempt to sell the vehicle itself.  If the vehicle sells for more than the amount owed by the dealer, the Auction keeps the profit.  If the vehicle sells for less than the amount owed by the dealer, the dealer remains liable for the deficiency.

This particular float program is described briefly on a one-page flier that is given to participating dealers. The dealers and the Auction never sign a written agreement.  It is unclear whether the Auction and Debtor ever discussed who would be the legal owner of the vehicles purchased through the float program. James Saddoris, the Auction's accounting manager, initially testified that he told Debtor that Debtor would own the cars from the time he tendered the highest bid at auction.  Under renewed questioning by the Auction's attorney, Mr. Saddoris subsequently claimed that he told Debtor that the Auction would own the cars. Debtor testified that he believed the Auction owned the cars, but he also testified that he believed he "bought" the cars the day of the auction, and that his name was put on the title immediately.  The testimony strongly suggests that neither party truly has any clear recollection concerning who would own the vehicles.

Prior to filing his petition, Debtor purchased three cars at the Auction using the float program.  After he filed his bankruptcy petition, Debtor sold two of the cars, and authorized the Auction to cash the checks he had given for them.  The Auction cashed the checks that it had received from Debtor prepetition and mailed the certificates of title to Debtor. Debtor was unable to sell the third car, so he returned it to the Auction, again post-petition.  The Auction sold this car for more

than the amount owed by Debtor.  During the entire transaction
involving this third car, the Auction never appeared on the
title.  The title was assigned from the original seller to
Debtor, then reassigned from Debtor to the second purchaser at
auction.  Auction kept the profit from the sale of the third car.

## CONCLUSIONS OF LAW

The Court must decide whether the three cars became property
of the estate on the day that Debtor filed bankruptcy.  If they
did, then Debtor's sale of the first two vehicles, and the
Auction's sale of the third, violated the automatic stay.  11
U.S.C. § 362(a)(3) and (6).  Trustee has the power to avoid
transfers of estate property made in violation of the automatic
stay.  11 U.S.C. § 549.  If the Court so orders, Trustee may
recover the value of such property from the party that benefitted
from the transfer.  11 U.S.C. § 550 (a)(1).

A debtor's estate consists of "all legal or equitable
interests of the debtor in property as of the commencement of the
case." 11 U.S.C. § 541 (a)(1).  The Court therefore must
determine what interest Debtor had in the three cars on Oct. 14,
2005, the day that Debtor filed his bankruptcy petition.

## CHOICE OF LAW

Before it can decide what interest Debtor had in the cars on
the day he filed bankruptcy, the Court must decide whether to
apply Iowa or Illinois law.  In deciding which state's law to
apply, a federal court must follow the choice-of-law rule adopted
in the state where it sits.  Klaxon Co. v. Stentor Elec. Mfg.
Co., 313 U.S. 487, 496 (1941); see also In re Payless Cashways,
203 F.3d 1081, 1084 (8th Cir. 2000) (holding bankruptcy court
must apply choice-of-law rule of state in which it sits).

Where the result is determined by the legal effect of a
contractual agreement between two parties, Iowa has adopted the
"significant relationship" test of the Restatement (Second) of
Conflict of Law § 188 (1971).  First Midwest Corp. v. Corporate
Fin. Assocs., 663 N.W.2d 888, 893 (Iowa 2003).  The test requires
the Court to apply the law of the state with the most significant
relationship to the issue and the parties.  "'Significant
relationship' is determined by reference to the place of
contracting, place of performance, location of the contract's
subject matter and the domiciles of the parties." Id.

The dispute is between the Auction and Trustee (who stands
in Debtor's shoes), concerning an agreement between the Auction
and Debtor.  The parties disagree about the effect of that
agreement – i.e., whether the agreement had the effect of passing
ownership to Debtor or giving Auction an ownership interest in
the vehicles.  To the extent that the parties have an agreement,

it was reached in Illinois, where the delivery of the vehicles also took place.  Because the Auction's "float" policy primarily is at issue here, and because the Auction does business with many States besides Iowa using this single policy, it is the conclusion of this Court that Illinois has the most significant relationship with these issues and the conduct of the parties must be evaluated applying Illinois law.

## OWNERSHIP UNDER THE UNIFORM COMMERCIAL CODE

The Auction claims that it, not Debtor, owned the three cars, because it retained possession of the certificates of title and had not yet received payment on the date Debtor filed his bankruptcy petition.  Trustee claims that Debtor purchased the cars using a line of credit provided by the Auction, making Debtor the owner and the Auction a creditor.

Illinois courts have explicitly addressed the question of who owns a vehicle as between an auto auction and a dealer who acquired the vehicle through the auction's float program.  In Arena Auto Auction, Inc. v. Mecum's Countryside Motor Company, Inc., 621 N.E.2d 254, 256 (Ill. App. Ct. 1993), the court held that "title retention is immaterial for purposes of determining ownership or rights in vehicle inventory."  The court concluded that the dealer-purchaser acquired ownership rights, even where the auction retains the certificate of title.  Id.  Similarly, in Central Nat'l Bank v. Worden-Martin, Inc., 413 N.E.2d 539, 541 (Ill. App. Ct. 1980), the court held that an auto dealer who purchased vehicles through an auction's float program had sufficient ownership rights to grant a first-priority security interest in these vehicles, despite the fact that the auction retained title.

The Uniform Commercial Code provides authority for this conclusion.  The relevant language reads: "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place."  810 Ill. Comp. Stat. 5/2-401(2)(emphasis added).

Applying the present facts, this statute can be interpreted in two ways.  While it is clear that the original "sellers" are those who sold the three cars at the Auction, it is less clear whether the original "buyer" of each car was the Auction or Debtor.  If the Auction was the original buyer, then it took title to each car when the seller relinquished the car and completed performance.  If, on the other hand, Debtor was the buyer, title passed immediately to Debtor, and the Auction never became an owner.

4

Two factors strongly support the latter interpretation. First, each sales ticket clearly listed Debtor as the buyer, while the Auction was unable to present any documentation establishing that it purchased any of the vehicles. Second, Debtor took possession of the cars immediately after the sale, and insured the cars in his own name. The only action the Auction took, which could be considered consistent with being a buyer, was paying the money to the sellers. This payment is, however, more consistent with an advance of credit to Debtor, given that Debtor took immediate possession of the goods.

If the Auction was not a "buyer" of these cars, it never owned any of them, despite its physical retention of the title certificates. Rather, Debtor became owner when he took possession of the vehicles.

The result might be otherwise had the parties "explicitly agreed" that the Auction would remain "owner" of the vehicles. 810 Ill. Comp. Stat. 5/2-401(2). There is no evidence, however, that such an agreement existed. The parties do not clearly recall any conversation about who "owned" the cars purchased at auction. The only writings concerning this matter are the sales tickets, listing each original seller as the seller of the vehicles and Debtor as the buyer. The evidence is compelling that no explicit agreement was reached.

To reach a resolution, the Court need not definitively conclude whether the Auction was the original buyer of the vehicles. Even if the Auction <u>were</u> the original buyer and became owner of the vehicles initially, it transferred ownership when it sold the cars to Debtor. The Auction disputes this characterization, claiming that the sale was not completed, because it hadn't yet received payment and it retained the certificate of title. However, "[t]he retention or reservation of title by a seller of goods is limited in effect to a reservation of a 'security interest.'" 810 Ill. Comp. Stat. 5/1-201(37).

In the final analysis, if the Auction truly was the owner of the vehicles, it is impossible to define the nature of the contract relationship between Debtor and the Auction. When Debtor purchased each vehicle at the Auction, he incurred a new debt to the Auction which was not contingent upon Debtor's being able to sell the vehicle. It was absolute. If the Auction owned these vehicles, Debtor received nothing in consideration for undertaking this obligation. This is not a logical interpretation.

## OWNERSHIP UNDER CERTIFICATE OF TITLE STATUTE

The Auction urges the Court not to decide this case under the Uniform Commercial Code, but rather to apply the Illinois

5

certificate of title statute.  Because these vehicles were
treated as fungible goods, the Court concludes that the UCC more
appropriately governs this transaction.  Even if the Court were
to rely exclusively on the title statute, however, the auction
does not benefit because the result remains the same.

The certificate of title statute requires that for a
transfer of ownership to be effective, the owner must "execute to
the transferee an assignment and warranty of the title in the
space provided on the certificate . . . and cause the certificate
and assignment to be mailed or delivered to the transferee or to
the Secretary of State."  625 Ill. Comp. Stat. Ann. 5/3-112(a).
If the Court were to apply only this general rule, it would be
forced to conclude that neither Debtor <u>nor</u> the Auction owned the
vehicles in dispute.  The sellers never executed an assignment of
the vehicles to either party.  The assignment on the certificate
of title was made to Debtor only after Debtor paid the Auction.
The statute, however, creates two exceptions to this general rule
that are relevant here.  Applying either exception to the present
facts, the Court must reach the conclusion that it did under the
UCC: the Auction never became an owner of the vehicles, Debtor
did.

The first exception maintains that a transfer of a motor
vehicle will be effective "as between the parties," even where
they have not complied with these provisions of section 3-112(a).
625 Ill. Comp. Stat. Ann. 5/3-112(e).  The sales ticket lists
Debtor as the buyer of these vehicles.  The "parties" to the
original transaction were the sellers and Debtor.  Therefore,
Debtor, and not the Auction, became the owner of these vehicles
under this exception.

The second exception applies to dealers: "No certificate of
title need be obtained for . . . [a] vehicle owned by a
manufacturer or dealer and held for sale . . . provided a dealer
reassignment area is still available on the manufacturer's
certificate of origin or the Illinois title."  625 Ill. Comp.
Stat. Ann. 5/3-102.  Again, this suggests that Debtor rather than
Auction owned the vehicles.  The Auction did not act as a dealer,
acquiring the vehicles and holding them for sale.  Rather, the
Auction allowed Debtor to take possession of the vehicles and
hold them for sale on Debtor's terms.

The Auction relies on Seventh Circuit authority interpreting
the certificate of title statute.  <u>In re Robison</u>, 665 F.2d 166,
168-69 (7th Cir. 1981).  <u>Robison</u> holds that, where the parties
have not complied with the statute, the parties' intent must
determine ownership.  <u>Id.</u>  Once again, the application of this
rule favors Debtor.  The evidence establishes that the Auction
never intended to "own" the vehicles.

6

"Intent should be determined by an objective standard which takes into account the economic realities of the transaction rather than the subjective intent of the parties." _In re Ide Jewelry Co._, 75 B.R. 969, 977 (Bankr.S.D.N.Y. 1987)(citations omitted).  The economic realities of this case clearly indicate that Debtor owned these vehicles, that he was absolutely liable for the purchase price, and that the Auction therefore was Debtor's creditor.  The circumstances suggest that Auction held onto the certificates of title as a form of security, not as a means of retaining ownership.  Therefore, the only result which can be reached under these facts is that the cars belonged to Debtor and became part of Debtor's estate on the day he filed bankruptcy.

**WHEREFORE**, Trustee's Complaint to Avoid Transfer and for Turnover is GRANTED.

**FURTHER**, the Court orders Defendant Greater Quad Cities Auto Auction to turn over all property or proceeds of property received by it from Debtor post-petition.

**FURTHER**, judgment shall enter accordingly.

Dated and Entered:  February 22, 2007

_____
Paul J. Kilburg
Bankruptcy Judge